Good morning, Your Honor. It's Monty Cooper on behalf of Plaintiff Appellants Animal Legal Defense Fund. Succinctly stated, we're here this morning to ascertain whether, without any proof, of how in the competitive egg industry the bidding process for price actually occurs, whether the government can, under the Freedom of Information Act, nonetheless withhold, under Exemption 4, production information generated from statistical and environmental testing at 13 egg facilities in Texas that is done for salmonella testing. This question encompassed the related question as to whether, regardless of whether this Court views production information as competitively sensitive information per se, such that it can be ordinarily withheld under Exemption 4, nonetheless, in this case, if the precise classes of information which include total hen populations at each of the farms in question, the number of hen houses at the farms in question, the number of floors per hen house at the farms in question, and the number of rows per house at the farms in question has been publicly disclosed by the parties such that the exemption cannot apply since we are talking about the trade secret and confidentiality exemption of FOIA. I wanted to ask you specifically, there's evidence in the declarations that even a one-cent difference in the price of a dozen eggs can cause consumers to change their purchasing habits, that is, that it's highly competitive. I did not see any contradictory evidence to that. So with respect to the highly competitive nature of the business, do you agree that that at least is undisputed on the record? It is, Your Honor. And there's also what I thought was undisputed evidence that, as a matter of fact, the companies do keep this information close to the vest, that is, they lock their facilities and build fences around their facilities and things to keep others from, you know, prying eyes. Is that also an undisputed fact? There is dispute as to the nature of the maintenance of confidentiality. It is not disputed that some elements of the information that we are talking about are subject to kinds of secrecy that you're referring to. However, for instance, Dr. Suderman noted that much of the bases that are provided by the government's witnesses for explaining, for instance, fencing, electronic monitoring of the farms and that are actually done for purposes of ensuring that there is not salmonella contamination outside the farm. But can't something be done for more than one reason? The fact that it's done for one reason doesn't negate that it's also done for another. So again, I'm not sure why that would be a dispute as opposed to an additional explanation. There is no dispute that the farms function in the way that the government witnesses state as it relates to the secrecy protections. There is a dispute as to the motivation for why those things are done. Well, that's what I'm trying to get at. If I say, well, we're motivated by secrecy, and you say, well, you're also motivated by safety concerns, why are those contradictory? I mean, mixed motive is a common thing in the law. Mixed motive is, Your Honor, but as with all trade secret type cases, the motivation evaporates as soon as there's evidence that outside the context of the secrecy argument provided by the witnesses, there's independent evidence that the very information that is allegedly secret has been publicly disclosed. That's a completely different question than the issue of whether motivation can be mixed. You're saying, well, it doesn't matter. I mean, your other argument is it doesn't matter what their first motive is because they've already told people, so they might as well tell us. But that seems to me a different argument. Your Honor, I would concede that there is always going to be a possibility that there can be mixed motives that some elements of secrecy could be related to health and some could be related to proprietary confidentiality. So, in what form has this information been disclosed publicly? Your Honor, we The specific information that you saw. There are approximately 36 exhibits that were introduced by one of the ALDF's witnesses that occurred roughly in the excerpts of record at 144 to 725. They're extensive. If I could provide you a couple of particularly notable examples that will highlight why ALDF contends that this information has been publicly disclosed. For instance, Exhibit H to the underlying motion for summary judgment at ER-221 reflects a public press release issued by Cal-Maine, and I would note Cal-Maine is the largest producer of eggs and is also the source of one of the government's primary witnesses, Lane Berry. The Cal-Maine will own two of Alfred's egg production facilities in Pittsburgh, Texas. The facilities each hold approximately or each hold about $1.4 million laying eggs. Now, that should cause this Court to pause right away. According to the government's primary witnesses, Mr. Ramirez, Mr. Berry, Cal-Maine and Mayhard Farms themselves produced declarations that said they do not disclose the ultimate production rate or number of egg-laying hens and certainly don't do it on a regional basis. Here, you have to Pittsburgh, Texas, the very regional market we are talking about, disclosures of the number of eggs. Not only is this press release done for business relation purposes and given to the general public at large, it begs the question, if the government's position about how disclosure occurs is correct, why is Mayhard selling a farm in the very market that it can competitively compete by underbidding, knowing full well what Cal-Maine's production facilities at both farms will be after the sale? There's nothing in the record to explain that because there's nothing in the record that ever explains how egg-bidding actually occurs. I will admit, Your Honor, that is the question I have, I think, for the government, is that how does knowing the rate production of the eggs result in underbidding? I'm not sure I fully understand how that, having read all these declarations, it's sort of a conclusory statement that they make, but I don't understand exactly how that happens. Your Honor, it was the ALDF's position below and on appeal that we also do not know and that that is fatal to the government's position in this case and is why not only is a reversal necessary, there is no remand. If the court concludes that that position is conclusory under the court's precedent, that is the end of the inquiry. Why is it? Is that because then there's an inadequate factual basis? You could argue one, and as the court, I'm certain, is aware, we have pointed out that historically this adequacy of the record is delineated de novo, and then the court's findings on summary judgment are evaluated for clear error. The court has twice, at least, questioned whether that is a proper basis, and to answer your question, Judge Wardlaw, I don't believe it matters under whether you have a full de novo standard, as we are advocating, or even if this court applies a clear error standard to the factual inquiry because it is always the government's that applies, and if the declarations are conclusory, that collapses into the question of whether on de novo review there is an adequate record. But, you know, the other side of the coin, if someone were to explain precisely and in detail how the information could result in substantial competitive harm, wouldn't they be disclosing the substantial competitive harm? In other words, it would somewhat potentially destroy the point of the exemption to have to explain it in detail. So what is your response to that concern? Well, first of all, it's the government's burden to show that these records generated by the government, not by the farms themselves, that are also generated for a monumentally important health issue, namely the introduction of a pathogen into the national food supply, is in fact subject to competitive bidding. So it's actually got to be the government's knowledge of the bidding process that substantiates the exemption. That doesn't really answer my question, because you earlier agreed that it's a highly competitive industry. Everybody seems to agree that that's true, that it's kind of a knife's edge in terms of the financial picture. And I guess my question is, if they had to explain not only that it does cause underbidding, but exactly how, wouldn't that undermine the existence of the privilege or the exemption by disclosing what shouldn't be disclosed? In other words, you can't say, well, show me the documents, and therefore we know that we shouldn't see them. That's my concern. Well, there's always measures, aren't there, that the district court could have required some explanation and have it under seal from the government? I mean, why does the government collect these documents anyway? The government collects these documents for testing procedures and largely to determine what testing equipment they need at the various chicken facilities, because it's known that there is a natural level of salmonella contamination even in a general chicken population. Certainly the government has an interest in ensuring that its own inspectors aren't killed by the process that they're ensuring doesn't occur in the general population. Under the Freedom of Information Act, do you have to explain why you want those documents, or do you just request them? Under the precedent of this circuit, it is unnecessary to look at the motivation of the micro, the court should in fact balance the interest of the public at large in the interest of the competitive harm that might occur. And in this case, that would mean a balance of public health versus the potential competitive harm that I view as speculative. How does the redacted information then that you're seeking shed light on the government and its activities? Because that seems to be the whole point of FOIA and trying to figure out why this disputed information. EIS information gives you a sense of what the health risks at individual farms are. The same information related to production capacity could be also viewed as statistical density information about chicken populations in each of the clutches. That is inherently where salmonella inspection occurs, and it allows us to have a view into the government's compliance with the egg safety rule, and also ultimately whether the government's compliance substantiates a risk of introduction. But the court did give you the information of how many chickens per cage, right? Yes, it did. So beyond, isn't that really the essential health question when you talk about density? In other words, if I have 10 chickens to a cage or 100 chickens to a cage, why do you care whether I have one cage or 50 cages? I would like to answer that and then reserve the remainder of my argument. The answer, Your Honor, is because each of the information gives independent valuation of risk. The total hen production is probably an even better evaluation of the risk of salmonella introduction, and it's also the one that is least held confidential based on the publicly disclosed information represented by the example I gave previously. With that, if it pleases the Court, I'd like to reserve the remainder of my argument. Certainly, you may do that. Thank you, Mr. Cooper. We'll hear from the government. May it please the Court, Lindsay Powell for the FDA. There are at least two ways that are supported by the record in which disclosure of any of the types of the information redacted here, if disclosed, would cause a substantial competitive harm with respect to bids for egg sales. The first is production capacity. How many eggs is each of these farms producing overall? And the second is with respect to efficiency. How efficiently are the farms producing eggs? Let me ask you my question. How does the rate of production, how does knowing that information result in underbidding? So it could come up in a number of different scenarios, but I think an example is helpful. So if a customer needed an additional 100,000 eggs per day because of the increased demand over the holidays, and it puts out a bid for this extra 100,000 eggs, if Farm A knows that can't fill that contract with eggs from its own farm, that's valuable information to Farm A. Farm B, if it wants to bid on that contract, will need to ship eggs from a different farm, go to a clearinghouse, purchase from a third party, and any of those things cost money to do. And so if Farm A knows that Farm B is in this position, it knows that it has a competitive advantage and it may decide to bid on this contract when it wouldn't have in the absence of this information because it doesn't have that relationship with the company in the first place. Seems rather speculative to me. Well, all of this is in the record, both the... You mean in the form of declarations? In declarations, yes. Yeah, I thought that the declarations were pretty self-interested by and large. They're all egg producers or the lobby for the egg producers. Or FDA employees, Your Honor. So Dr. Jerry Ramirez testifies extensively in his declaration. I think the most important page of that is at ER 839, and he talks about the ways in which capacity information can cause competitive harms for the reasons I just said. And another one, and one that he talks about, is the importance of location. So that if you know, again, the production at a particular farm, you also know where your farms are located and where your production is, and you might see that you have a locational advantage so that you can get eggs to a customer more cheaply. And you wouldn't be aware that you had that additional information about your competitor. And because this information is so closely guarded, that's not information that the farms currently have. So disclosure would give... It would create information asymmetries that don't currently exist and create competitive harms for the farms whose information is at issue here. Go ahead. Is there any evidence in the record that companies have used such... This kind of disclosure against their rivals? There's nothing in the record on that either way. But what is clear in the record is two things. One, consistent testimony, not just from industry, but also from FDA officials knowledgeable of the industry, that these harms would occur. And also, you know, broad historical data that this information isn't disclosed. So the examples that plaintiffs cite of disclosure are different. They involve different information. That's what I wanted to ask you about. Because that certainly would destroy the exemption if the very information at issue were already disclosed in some form that negated the commercial secrecy of it. So what specifically is different about the things that have been disclosed? Yes, Your Honor. So most of the information that plaintiff points to is aggregated data. So they look to all of these cow main sources that look at total hen population and egg capacity across a very large number of farms. And that's simply very different data and can't be used in the same way as farm specific data for the reasons I've just talked about. You can look back to those examples and aggregated data doesn't mean the same thing. The example that counsel pointed to earlier at page 221 of the excerpts of record is a useful example. There are a few outlier instances where farm specific information is detailed and this is one. But all we see in that Pilgrim's Pride acquisition notice is that there are 1.4 million hens at the two farms at issue. That's not remotely the same information that we're talking about here. But it is because total hen population is the first item that they asked for that's been rejected. So I'm not quite sure why total hen population is different than total hen population. Well, the numbers are different. So the level of specificity in the EIRs is very different from this. So it would be much... Why? 1.4 million is a fairly broad approximation. You can have a margin of 49,000 hens there that you don't know that you're talking about. It doesn't go to the same level of detail as the population data in these reports. But there are also four other categories of information that we're talking about. Well, that's right. But that doesn't mean... I mean, this is not an all or nothing thing as we know because the district court ordered the disclosure of the number of birds per cage and that hasn't been appealed. So we know that just because one thing is disclosed, it's not all or nothing. Right. And that's true with respect to the particular farms too. So again, 1.4 million is not the same number. It's not the same information that's in the EIR and that's important. It's much more detailed and comes from a different point in time. So it's not the same information even with respect to population. But if for the court to disagree and believe that disclosure in that document at 221 was sufficiently close with respect to population, all that would follow is disclosure of that piece of information with respect to that farm. And again, I should note that that particular farm that's at issue there is not one of the farms whose information is at issue here. So in fact, nothing follows from that document. I had another question that relates to timing. The request was for records that existed in I think 2011, something like that. A lot of hens have come and gone since then. And does that have any bearing on whether this information should be disclosed? That is, it's sort of ancient history by now. Why would it be a problem for current competitiveness when it's such old information? It's appropriate to review the record as it exists, as of the time it was created. And the record has not been updated to introduce anything to suggest that this information has become stale. If plaintiff disagrees, it's free to submit a new request explaining to FDA on that basis that the information is no longer subject to withholding. But the court reviews the record as of the time that it was created, and that record does not reflect anything about staleness. We also don't think that it's become stale in the interim. But any argument to that extent would be pure speculation on this record. I want to go back to these specific questions. This may be just a too simple way to look at it, but why can't a competitor today just call an egg buyer in a given market and offer to sell eggs at a reduced price? There's no evidence that that's how bidding works in this industry. What the evidence does show is that by using this information, by gaining access to this information, that a competitor would gain an advantage because it would have informational asymmetries. It would know things about its competitor that go to total production ability and also efficiency. How efficiently these eggs are being produced, what the costs of production are, and that information can be used in putting forth a more competitive bid. There's nothing in the record to suggest that there's this dialogue with customers that obviates the value of this information. I think Lyon Reasons is incredibly important. I want to get this question out there. The plaintiffs put forth a declaration by a professor of economics at the University of Chicago, which flatly contradicts a lot of your assertions and the declarations that the government put in. Doesn't that create a genuine disputed issue of fact as to this analysis? No, Your Honor, because at the lining of the declarations, what Dr. Gay says in his is just that more information is needed to have a complete picture of production costs. So what he's saying is that providing the information that the district court ordered withheld does not create a substantial, which is your burden, issue as to the competitiveness of the industry. So he's putting that into contention. Insofar as that's what he says at that level of generality. That's not a fact that could be disputed. That's just a conclusory statement. No, it's actually the opinion of an expert who has analyzed the material, just like your declarations did, and put in contrary economic analysis. But what the declaration goes on to say, to the extent it endeavors to give content to that statement, is that more information is necessary to get a complete picture of the competitive position of a farm. But that's what I'm struggling with, is why is summary judgment appropriate here, when it seems to me that even in the course of the district court's order, she was making her findings, and typically in the summary judgment context, particularly when we have cross motions for summary judgment, this would be something that would have to go to trial. But there are no disputed issues, and that's what the district court correctly found. So when Dr. Gay is saying that you need more information to have a perfect picture of what a farm is doing, that's simply not what the FDA declarants are talking about, because that's not what lie and reasons requires.  That's not the standard. You don't need to know everything about the bidding process. I thought in lie and reasons, there weren't any disputes of fact. Just as there aren't here. I want to understand your view on our standard of review. Let's just, for argument's sake, say that there is a genuine question of material fact created by the declarations and evidence submitted by ALTF. Was that the proper procedure that the district court undertook? So in GC micro and lie and reasons, the court did state that it was reviewing for clear error in precisely this posture, but what the district court here found and what we think is— I just want to know, when there is a genuine issue of material fact, how do you think the district courts are supposed to proceed, and how are we to review that? Typically on summary judgment, if there is a disputed issue of fact, then summary judgment is not appropriate, that there should be— So then they go to a trial? Or there could be further discovery, although both trial and discovery are highly disfavored in FOIA cases. That would be a very unusual way to proceed. But here, there are no disputed issues. The very brief declarations submitted by the other side are talking over the FDA declarants. They're not engaging at the same level of specificity so as to actually be creating an issue about these facts. What Dr. Gay says is not that Dr. Ramirez is wrong about how this bidding works and how different efficiencies can be taken advantage of with respect to the shipment of eggs. What he says is you don't have perfect information about the industry just from these categories of redacted information, and that's not what lie and reasons requires. Lie and reasons is really on all fours with this. I want to ask another factual question. Isn't this the same information that the egg producers actually provide to their lobbyist organization under the UEP certified program? They do provide some of this information to UEP, but what the uncontradicted UEP declaration says is that information is held under lock and key and not shared with anybody other than the firm that was disclosing it in the first place. There's nothing to contradict that. What is UEP and why does it gather this information? UEP sets voluntary animal husbandry standards, and much of the industry chooses to comply with those standards. To ensure that compliance is actually being undertaken, UEP conducts certain audits and gathers this information. It's not the type of cooperative that Dr. Suderman suggests in his declaration by analogy to Organic Valley, and he gives no reason to think that they're remotely the same type of organizations. It's not a cooperative in the same sense. It's just an entity that is establishing these guidelines and ensuring compliance with those who have chosen to comply. But what the declarations say, and they're not contradicted, is that that information is protected and it's not disclosed. With respect to the very few instances that plaintiff points to where there's been any type of disclosure with respect to a particular farm, disclosure would only follow from those instances if it's the same farm and the same type of information. And in each instance, it's not. I think what plaintiff wants you to do is to infer from those occasional instances of disclosure, which again present different data, that this information is somehow not valued by industry, and so you should infer broadly that it's not confidential. And that's not the way in which public disclosure is relevant here. If a particular piece of information had already been disclosed, such that an additional disclosure would be redundant, then of course disclosure wouldn't cause a competitive harm and Exemption 4 wouldn't protect it. Is there any evidence of past underbidding in the record here? No, but there is extensive discussion of the ways in which it could be done. But this information historically has not been disclosed, which is part of the reason why you would expect to see that. Do you have a history of what happens when it's disclosed? Because it hasn't been disclosed. Because it hasn't been disclosed. I also want to briefly mention there are a number of other ways in which the record supports – shows that competitive harms would follow. One is with respect to farm acquisitions, sales of farms. That's in the Razor Declaration at the Supplemental Excerpts of Record 26. And he shows that if you know information about another farm's inventory, which is all of this information, how many hens it has, barns, the way its productions and operations are configured, that that's information that one farm trying to sell could use against another selling farm to try to underbid. There are a lot of acquisitions in this industry, bigger companies buying smaller farms, and one farm that's trying to sell could compete with another by using this information to its advantage. That's in the Razor Declaration, and it's not contradicted. The only mention of it in plaintiff's declarations is in the Suderman Declaration, and there all he says is that farms may be motivated to sell for reasons other than what their inventory is. But that's a completely separate point. Why you're motivated to sell doesn't speak to your competitive advantage in selling, and you gain that advantage by knowing your competitor's inventory when they don't know that about you. Thank you, counsel. You have some rebuttal time remaining. Thank you, Your Honor. I want to address one thing very quickly. Counsel indicated that alternative bases existed in the record, including infrastructure and farm sales. As the court can confirm at ER 8, the district judge elected not to resolve the issue on either of those two issues. As a result, there is no finding on those particular questions. Why does that matter? Can't we affirm on any ground that was presented below, even if the district court didn't resolve it? You can. In this instance, both issues were contested by declarations of the ALDF, so you would also have to resolve on the first instance as to whether there are any disputed issues of material fact. Going to the question that your colleagues inquired about, would we have to remand if there is a disputed issue of fact, I would direct the court to perhaps the best road of appeals, Greenberg v. FDA case, 803 F2D 1213. There, that case, which is an Exemption 4 case, the government did, as in this case, introduce declarations to support a position that the disclosure of customer lists generated by the government of a particular manufacturer of CAT scans, if disclosed to one of its other competitors, would, in fact, be competitively sensitive and, therefore, was exempt under FOIA Exemption 4. Unlike the Lion Raisins, unlike GC Micro, unlike any other case you've heard discussed today, but like this case, the party seeking the FOIA request introduced its own declarations to show that in the competitive market, the information could either be reverse engineered, much like our production information here that we cite is already in the public domain, or that there were alternative bases that the information could be gleaned from the customers. The Court of Appeals recognized that in that instance, even if the government had satisfied its FOIA Exemption 4 analysis under summary judgment, under classical summary judgment burden shifting, once the defendant or, I mean, once the plaintiff, much like ALDF, introduced the information contravening that position as it relates to the competitive market, the case had to be remanded for further proceedings because there was, in fact, a Thank you, Counsel. Thank you, Counsel. Thank you. We appreciate very much the arguments of both counsel on this interesting and difficult case, and the case is submitted for decision.
judges: Wardlaw, Graber, Murguia